

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35483-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEBRA JEAN SHOEMAKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Debra Shoemaker appeals the standard range sentence imposed following her plea of guilty to burglary in the second degree and theft in the third degree. She contends that the trial court denied her request for a drug offender sentencing alternative (DOSA) after improperly considering adjudicative factual information from victim representatives. Alternatively, she contends her trial lawyer provided ineffective assistance of counsel when he failed to object to that information.

No. 35483-1-III
*State v. Shoemaker*

The trial court did not err in allowing the victim representatives to speak at sentencing and did not err by considering the unobjected-to information they provided. We affirm.

FACTS AND PROCEDURAL BACKGROUND

On January 24, 2016, a Wenatchee home was burglarized following a forced entry through a garage man door. In addition to stealing personal property from inside the home, the burglars left the scene in the homeowner's Toyota Highlander. Almost six months later, DNA[1] from a latex glove recovered from inside the home was reported to Chelan County law enforcement to be a match for Debra Shoemaker. A detective arrested Ms. Shoemaker the next day. Upon being arrested, she told the detective that her acquaintance, Cindy Simpson, "had set her up." Clerk's Papers (CP) at 1.

Ms. Shoemaker was taken to the police station where she received *Miranda*[2] warnings and agreed to a recorded interview. A probable cause affidavit filed with the superior court summarized her statement as follows:

> Shoemaker admitted to breaking in to the residence through the side garage door. She said she and Cindy hit the door with their shoulders until it broke. She said they loaded items stolen from the residence into the victim's vehicle. She then drove the vehicle to Cindy's house where they unloaded the stuff. She claimed her motivation to commit the crime was because she felt sorry for Cindy because she was down or [sic] her luck and had been losing badly at gambling.

---

[1] Deoxyribonucleic acid

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

CP at 1.

After booking Ms. Shoemaker, the detective arrested Cindy Simpson. In his probable cause affidavit in Ms. Shoemaker's case, the detective described Ms. Simpson as very uncooperative. According to his affidavit, Ms. Simpson "screamed at me that 'Debbie had set her up! I never robbed in [sic] house![']" CP at 2. Both women were charged with residential burglary, vehicle theft, malicious mischief, and third degree theft. Ms. Shoemaker was additionally charged with possession of methamphetamine found in her purse when she was searched incident to arrest.

Ms. Shoemaker engaged in plea negotiations, and the State eventually offered to dismiss the malicious mischief, vehicle theft, and possession of methamphetamine charges so that her standard range would qualify her for a residential DOSA. In her statement on plea of guilty, she provided the following statement of facts making her guilty of the crimes:

> On January 24, 2016, in the City of Wenatchee, County of Chelan, I entered the house of another individual without permission with Cindy Simpson to take prescription pills for Cindy to sell. Cindy also packed a duffle bag with personal belongings of the residents. I carried the duffle bag out of the house and into the car. I knew Cindy would try to sell those items value less than $750.00.

CP at 45.

The trial court accepted Ms. Shoemaker's guilty plea at a hearing on April 3, 2017. At that time, there was further discussion about the nature and value of what was stolen:

> THE COURT: Now, I understand, though, the value maybe is more than $750 and you're agreeing to pay restitution on whatever is proven; is that correct?
> THE DEFENDANT: Yes.
> THE COURT: Okay. And I don't—I don't know actually what was taken.
> [PROSECUTOR]: It was primarily jewelry belonging to [the victim's] deceased wife; is that correct?
> [DEFENSE COUNSEL]: And there was other—other memorabilia, Your Honor.
> THE COURT: So the value of those may be over or under $750, but we're going to expect you to pay restitution on whatever is proven or agreed to. Do you understand that?
> THE DEFENDANT: I do.
> THE COURT: All right.

Report of Proceedings (RP) (Apr. 3, 2017) at 21-22. At the time the plea was accepted, there was discussion that sentencing would not take place until June because the victim's family wanted to be present for sentencing and would be unavailable in May.

The sentencing ultimately took place on July 17. RP (July 17, 2017) at 2. At the outset of the hearing, the prosecutor explained that the State was recommending the agreed DOSA as the correct sentence but stated, "[T]he family, I understand does feel differently, and they would like to have a chance to speak." *Id.* at 6. The court responded, "Maybe I should hear next from the family so that [defense counsel] and Ms. Shoemaker have the benefit of those comments when they address the court." *Id.*

4

George Harmon was the homeowner and victim of the burglary and was present at sentencing. But also present and prepared to speak on his behalf were Steve Myers, a friend of the Harmon family, and Mr. Harmon's grandson, Mike Rollins. Mr. Myers prefaced his comments by stating that he had been working on the case for "some eighteen months" and wanted to give the court "a further appreciation of the crime." *Id.* at 7.[3] He then conveyed the following information:

- On December 5, 2015, Ella Harmon, Mr. Harmon's wife of 63 years, had died.

- On January 17, 2016, Mr. Harmon left Wenatchee to visit family in Portland "to deal with the death of his wife and to sort of get through it." *Id.* at 9.

- Ms. Shoemaker learned that Mr. Harmon's wife had died and that Mr. Harmon would be away from home because Ms. Shoemaker's husband was in a carpool with one of Mr. Harmon's relatives.

- A private investigator obtained video that showed Ms. Shoemaker with Ms. Simpson inside a convenience store, making three phone calls to the

---

[3] Mr. Myers informed the court that he was a lawyer, but was speaking for the family as a friend.

Harmon home at 3:30 a.m. on the morning of the burglary, information

Mr. Myers characterized as "all uncontroverted essentially." *Id.* at 11.

- After confirming that Mr. Harmon was gone, Ms. Shoemaker and Ms. Simpson traveled to his home where they took "virtually all the mementos—heirlooms, jewelry, clothing—that belonged to his wife," including what Mr. Myers described as "his-and-her" jewelry items that Mr. Harmon and his wife had exchanged as gifts "on anniversaries and birthdays and whatnot." *Id.*

- Mr. Myers told the court that the family had been "desperately trying to find where the goods are, the very most important thing to George Harmon," and that they had spoken with Ms. Shoemaker "trying to get leads" but she consistently denied any knowledge of the disposition of the stolen property other than that it had been in the possession of Ms. Simpson. *Id.*

- He characterized the burglary as carefully planned, pointing to the clothing the women wore when captured by the convenience store video, the fact that they were prepared to "crack[ a] double bolted garage door frame," and the fact that upon leaving the car they had disassembled the fob and wiped everything down so that no electronic memory or fingerprints would be left behind. *Id.* at 12.

Mr. Myers concluded by stating, "I can say with some certainty the family respectfully requests that the Court sentence her, Debbie Shoemaker, to a prison term that takes into account the extraordinary circumstances." *Id.* at 15. At no point when Mr. Myers was recounting this information did Ms. Shoemaker object or contend that some different evidentiary hearing was required.

The court next heard from Mr. Harmon's grandson, Mike Rollins, who stated:

> I just want the Court to get an idea of who George Harmon is. He's a Korean War veteran. The one thing that defined my grandfather was his love for my grandmother. All of that was taken from him on that night. She had already passed away, but they took every memento that meant so much to my grandfather. It's probably one of the coldest things that I've ever witnessed.
>      Since that time, his health has deteriorated. He had shingles right after. He had a stroke. He's not living in his house. He wasn't even—he didn't feel secure enough to even stay at his own home. He stayed with my parents and lived there because he was scared to go home.
>      I just ask, your Honor, that you take all that into consideration because I feel like the sentencing needs to be pretty harsh for this—for this act.

*Id.* at 16. Again, Ms. Shoemaker did not object or suggest that the court should conduct a separate evidentiary hearing.

The court then invited Ms. Shoemaker's lawyer to speak. While he told the court that Ms. Shoemaker had been "very upfront and honest with me about what took place" and he believed Ms. Shoemaker told the family as much as she knew about the stolen property, he did not dispute the facts that had been recounted by Mr. Myers or Mr. Rollins. *Id.*

7

After hearing from a psychiatric nurse practitioner who had treated Ms. Shoemaker and spoke in favor of the DOSA, the court stated, "All right. Ms. Shoemaker, you have the opportunity to address the Court. What would you like to say today?" *Id.* at 20. Ms. Shoemaker read aloud a letter she had written to the Harmon family apologizing for "the senseless things I did" and "all the fear that you had because of this." *Id.* She read, "I did this to your family and you, and no one deserves that." *Id.* at 20-21. After explaining that she had fallen into gambling and drugs, she read, "I know that doesn't seem like an excuse for my action and the choice I made that night to rob their house—or his house." *Id.* at 21. She read, "I take full responsibility." *Id.* She read, "I just want you to know how deeply sorry I am for what I did and want you to know I tried to get all your things back but wasn't able to." *Id.* at 22. She said nothing that diminished her role in the burglary and theft and did not dispute any of the information related by Mr. Myers or Mr. Rollins.

After taking a break so that defense counsel could provide an agreed criminal history, the court reconvened the sentencing, stated that the signed criminal history would be filed, and then said, "Okay. Did everybody get to say everything they wanted to say?" *Id.* at 27. Only the prosecutor responded, stating, "Yes, your honor." *Id.*

The court then began to announce its sentencing decision, expressing sympathy for Mr. Harmon. When the court, addressing Ms. Shoemaker, stated, "It appears to the Court . . . that this was a very calculated crime," Ms. Shoemaker asked to "explain something."

8

*Id.* at 29.  The court listened as Ms. Shoemaker offered excuses as to why Mr. Harmon's

inability to recover the stolen property was not her fault, but the court was not impressed.

Through questioning of Ms. Shoemaker, the court confirmed that Ms. Shoemaker—who

claimed to have had immediate remorse for the crime—knew where the police station

was located and could have reported the crime the morning after it occurred, but did not.

Told by a Harmon family representative that Ms. Shoemaker never provided timely

information identifying any of the people involved, the court stated, "All right.  That's

what I wanted to know." *Id.* at 33.  Addressing Ms. Shoemaker, the court continued:

> [I]t's easy, Ms. Shoemaker, to be sorry when you're standing here before
> the Court.  The time to have been sorry and to have taken action would
> have been back on January 24th or 25th . . . or 26th when the police could
> have gone to Ms. Simpson's house and retrieved some of these special and
> significant items that were taken.

*Id.*  The court refused to impose a residential DOSA and instead sentenced Ms.

Shoemaker to the high end of the standard range.

Ms. Shoemaker appeals.

## ANALYSIS

Ms. Shoemaker makes three assignments of error, two of which require analysis.[4]

She contends (1) the trial court erred by allowing victim representatives to present

---

[4] Ms. Shoemaker's third assignment of error raises an appearance of fairness concern.  Because it is based solely on the sentencing court's consideration of information we find the court was entitled to consider, and seeks only reassignment in the event of remand, we need not address it.

adjudicative facts at the sentencing hearing and by considering those facts in imposing

sentence, and (2) her trial lawyer provided ineffective assistance when he did not object

to the victim's representatives' presentation of information. We address the contentions

in the order stated.

I.      THE SENTENCING COURT DID NOT ERR BY HEARING FROM VICTIM
REPRESENTATIVES AND RELYING ON THE INFORMATION THEY PROVIDED

Generally, a court's decision to impose a standard range sentence is not

appealable. *State v. Conners*, 90 Wn. App. 48, 51, 950 P.2d 519 (1998). But a defendant

may appeal the trial court's failure to follow a required procedure. *State v. Ammons*, 105

Wn.2d 175, 183, 713 P.2d 719, 718 P.2d 796 (1986). Ms. Shoemaker argues that the trial

court violated required procedure by allowing victim representatives to provide evidence

and by considering the evidence they presented in imposing sentence.

Article I, section 35 of the Washington Constitution grants certain "basic and

fundamental rights" to victims of crime, including the right to "attend trial and all other

court proceedings the defendant has the right to attend, and to make a statement at

sentencing . . . subject to the same rules of procedure which govern the defendant's

rights." If the victim is unavailable for any reason, the prosecutor may identify a

representative to exercise the victim's right. *Id.*; *see* RCW 7.69.030(14) (victim has the

right "to present a statement personally or by representation, at the sentencing hearing for

felony convictions"). Given the amendment's "clear wording," the Washington Supreme

Court has construed it as giving victims the right to make a statement at sentencing "unless there is a direct constitutional impediment." *State v. Gentry*, 125 Wn.2d 570, 628-29, 888 P.2d 1105 (1995).

A corollary provision requires the sentencing court to consider "arguments from . . . the victim . . . as to the sentence to be imposed." RCW 9.94A.500(1). The provision has been described as "provid[ing] for 'a baseline—a minimum amount of information which, if available and offered, *must* be considered in sentencing.'" *State v. Sanchez*, 146 Wn.2d 339, 353, 46 P.3d 774 (2002) (quoting *State v. Mail*, 121 Wn.2d 707, 711, 854 P.2d 1042 (1993)). In *State v. Lindahl*, this court, broadly viewing a sentencing court's discretion to consider information about the defendant and a crime, rejected an argument that the lawyer for a victim should not have been allowed to file a sentencing memorandum and argue in favor of an exceptional sentence upward. 114 Wn. App. 1, 14-15, 56 P.3d 589 (2002).

Ms. Shoemaker cites *State v. A.W.*, 181 Wn. App. 400, 411, 326 P.2d 737 (2014), as authority for the proposition that victims are not allowed to present evidence at sentencing, but that case is inapposite. In *A.W.*, a victim sought to intervene as a party and make a motion for court-ordered relief. Mr. Harmon's representatives did neither.

Since no constitutional impediment is shown, a victim making a statement at sentencing has as much right to present evidence as do other participants.

11

A provision of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, does impose limitations on sources the sentencing court may rely on; it is currently codified as RCW 9.94A.530(2). *Sanchez*, 146 Wn.2d at 353 (citing former RCW 9.94A.370(2) (2000)). It provides in relevant part:

> In determining any sentence other than a sentence above the standard range, the trial court may rely on no more information than is *admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing,* or proven pursuant to RCW 9.94A.537. Acknowledgment includes not objecting to information stated in the presentence reports and not objecting to criminal history presented at the time of sentencing.

RCW 9.94A.530(2) (emphasis added).

Our Supreme Court has held that the language used in RCW 9.94A.530(2) "clearly demonstrates that a sentencing court may rely on . . . something less than the usual adversarial process ('information . . . admitted, acknowledged, or proved . . .')." *State v. Handley*, 115 Wn.2d 275, 281, 796 P.2d 1266 (1990) (some alterations in original) (discussing former RCW 9.94A.370(2)). "Furthermore, 'a sentencing judge is not limited to consideration of facts that would be admissible at trial." *Id.* (quoting *State v. Herzog*, 112 Wn.2d 419, 430, 771 P.2d 739 (1989)). Evidence rules do not apply to a sentencing hearing. ER 1101(c)(3).

Mr. Myers explained to the court that Mr. Harmon's family had engaged a private investigator and that he was recounting what he had learned from his year and a half involvement in Ms. Shoemaker's prosecution. There is no reason to find his information

any less reliable than the information the court sought or received from others during the sentencing hearing. Given the relaxed process for providing information to a sentencing court (other than criminal history information, discussed below), Mr. Myers and Mr. Rollins can be said to have "proved . . . at the time of sentencing" the facts they stated to the court. RCW 9.94A.530(2).

The SRA also provides that "if no objection is raised to the information presented or considered during sentencing, then that information is considered 'acknowledged'" *State v. Mail*, 121 Wn.2d at 712 (quoting former RCW 9.94A.370(2)) (defendant failed to object to facts identified by sentencing court as having come from a prior conviction file); *accord State v. Grayson*, 154 Wn.2d 333, 339, 111 P.3d 1183 (2005) ("'Acknowledged' facts include all those facts presented or considered during sentencing that are not objected to by the parties."). "In order to challenge the information, the objection must be both timely and specific." *Mail*, 121 Wn.2d at 712 (citing *Handley*, 115 Wn.2d at 283).

It is only "where a defendant raises a timely and specific objection to sentencing facts" that the court "must either not consider the fact or hold an evidentiary hearing." *Grayson*, 154 Wn.2d at 339. Dicta in *Grayson* mused that a party might be excused for failing to make a timely, specific objection if a sentencing court abruptly and categorically foreclosed discussion of an adjudicative fact. But the *Grayson* court

13

declined to hold as much, adding, "The best practice is to promptly object." *Id.* at 341

(citing *Mail*, 121 Wn.2d at 712).

Ms. Shoemaker voiced no objection to the information provided by Mr. Myers and

Mr. Rollins, nor did she request a separate evidentiary hearing.

Ms. Shoemaker's final argument related to this assignment of error is that the

sentencing court relied on untested facts in violation of her right to due process, citing

*State v. Ford*, 137 Wn.2d 472, 973 P.2d 452 (1999). *Ford* deals with information about

criminal history—a type of sentencing information that gets unique treatment, since the

State must prove a defendant's criminal history by a preponderance of the evidence. *Id.*

at 479-80. In *Ford*, the State provided literally no information on the basis of which the

sentencing court could classify a defendant's out-of-state convictions. The Supreme

Court observed that to calculate an offender score, the court is required to classify out-of-

state convictions, something it cannot do in the complete absence of underlying

information. *Id.* at 479. It analyzed the classification of crimes as a *conclusion* of the

court, necessarily based on facts. *Id.* at 483. It was "the admitted lack of *any* evidence

supporting classification" that *Ford* found to fall below even the minimum requirements

of due process. *Id.* at 481 (emphasis added).

*Ford* not only did not question well-settled Washington case law that

unchallenged facts are acknowledged and can be relied on by a sentencing court, it

restated that law itself:

14

>While unchallenged *facts and information* are acknowledged by the
>defendant and may be properly relied upon by the court to support a
>determination of classification, under the statutory scheme classification of
>out-of-state convictions is a process unto itself, entirely distinct from the
>acknowledged existence of any fact which informs the court's conclusions.

*Id.* at 483.[5]

The trial court did not err in allowing Mr. Myers and Mr. Rollins to speak or by

taking into consideration the information they provided—information that Ms.

Shoemaker acknowledged, given her failure to object or request a separate evidentiary

hearing.

II.     INEFFECTIVE ASSISTANCE OF COUNSEL IS NOT SHOWN

Effective assistance of counsel is guaranteed by both the Sixth Amendment to the

United States Constitution and article I, section 22 of the Washington Constitution.

---

[5] This court's opinion in *State v. Mendoza*, 139 Wn. App. 693, 708, 162 P.3d 439
(2007), which the Supreme Court affirmed, 165 Wn.2d 913, 205 P.3d 113 (2009),
addresses the fact that the requirement for a criminal defendant's *affirmative*
acknowledgement of criminal history information does not apply to other information
provided at sentencing:

>For clarification, we note that our holding is limited solely to proof
>of prior convictions for the purpose of calculating offender scores and not
>to the other types of evidence that a trial court can consider during
>sentencing. CrR 7.1 and RCW 9.94A.500 provide that the trial court can
>allow argument from the prosecutor, the defense counsel, the offender, the
>victim, the survivor of the victim, or a representative of the victim or
>survivor, and an investigative law enforcement officer, as well as the
>submission of documents other than those provided by the [Department of
>Corrections]. But neither allows these arguments to supplant the State's
>burden to prove criminal history by a preponderance of the evidence.

15

*Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984);

*State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995). To demonstrate ineffective

assistance of counsel, a defendant must show two things: "(1) defense counsel's

representation was deficient, i.e., it fell below an objective standard of reasonableness

based on consideration of all the circumstances; and (2) defense counsel's deficient

representation prejudiced the defendant, i.e., there is a reasonable probability that, except

for counsel's unprofessional errors, the result of the proceeding would have been

different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (emphasis

omitted). A failure to make either showing is fatal to an ineffective assistance of counsel

claim. *Strickland*, 466 U.S. at 700.

Analysis of a claim of ineffective performance begins with a strong presumption

that counsel's performance was reasonable. *State v. Kyllo*, 166 Wn.2d 856, 862, 215

P.3d 177 (2009). A defendant must show the absence of legitimate strategic or tactical

reasons supporting the challenged conduct. *State v. Reichenbach*, 153 Wn.2d 126, 130,

101 P.3d 80 (2004).

Ms. Shoemaker contends that her trial lawyer provided ineffective assistance by

failing to object to the information provided by Mr. Myers and Mr. Rollins. She is

unable to show that this was deficient representation or that it prejudiced her. Had her

trial lawyer objected and requested an evidentiary hearing, the sentencing court would

likely have conducted the hearing on the spot. Mr. Myers and Mr. Rollins evidently had

personal knowledge of much of what they said, and the court could consider hearsay. If other witnesses' testimony was required, Ms. Shoemaker's lawyer might well have believed that the family could prove everything the victim representatives had stated. Ms. Shoemaker had already had the chance to tell her side of the story and made numerous admissions in the letter she read to the court. On the few and likely immaterial facts she disputed, her lawyer might have concluded that he had no other witness who could back her up.

For the same reason, Ms. Shoemaker cannot show prejudice. She can point to nothing in the record that suggests an objection or request for an evidentiary hearing would have led to a more favorable sentencing outcome.

Ms. Shoemaker has moved the panel to exercise its discretion to waive costs on appeal. Under RAP 14.2, "[a] commissioner or clerk of the appellate court will award costs to the party that substantially prevails on review, unless the appellate court directs otherwise in its decision terminating review."

In order for the panel to exercise informed discretion, a general order of this division requires an appellant to request waiver of costs on appeal in his or her opening brief or by a motion filed and served within 60 days following the filing of the opening brief. *See* Gen. Order of Division III, *In re the Matter of Court Administration Order re: Request to Deny Cost Award* (Wash. Ct. App. June 10, 2016), https://www.courts.wa .gov/appellate_trial_courts. If the appellant is alleging inability to pay, he or she is

required by the general order to provide the trial court's indigency report and a report as to continued indigency and likely future inability to pay. *Id.*

Ms. Shoemaker complied with our general order. Based on the information provided, we decline to award the State costs on appeal.

The sentence is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

I CONCUR:

Pennell, A.C.J.

18

No. 35483-1-III

FEARING, J. (dissenting) — I conclude that, at a minimum, Debra Shoemaker disputed some facts during her sentencing hearing. The law does not readily resolve whether she acknowledged other facts. Based on the dispute of facts, if not unacknowledged facts, the sentencing court possessed an affirmative obligation to conduct an evidentiary hearing regardless of whether Shoemaker requested an evidentiary hearing. The procedure followed by the sentencing court did not entail an evidentiary hearing. Thus, I would remand for a new sentencing hearing.

I begin with more of the background behind the sentencing of Debra Shoemaker. One month after the State filed charges against Debra Shoemaker, Trevor Travers, a licensed psychologist at Eastern State Hospital, interviewed Shoemaker, then age fifty-four years, and reviewed police reports, medical records, and Western State Hospital records. Shoemaker experienced a long history of drug abuse and physical cruelty. Travers diagnosed Shoemaker with possible bipolar disorder, polysubstance use disorder, borderline personality features, and posttraumatic stress disorder. The psychologist

opined that Shoemaker should be evaluated by a designated mental health provider due to her self-injurious behavior and borderline personality features.

During plea negotiations, the State graciously offered to dismiss malicious mischief, vehicle theft, and possession of methamphetamine charges so that Shoemaker would qualify for a drug offender sentencing alternative (DOSA). The State agreed to recommend to the sentencing court the alternative sentence.

The State of Washington filed an amended information wherein it lowered the charge of residential burglary to burglary in the second degree and omitted all other charges except the third degree theft. This reduction in charges lowered the range of confinement from between forty-three and fifty-seven months to between seventeen and twenty-two months. A treatment facility and the Department of Corrections screened Shoemaker and found her eligible for a DOSA sentence based on her strong urges for controlled substances, her preoccupation with drugs, and her neglect of other activities. Shoemaker registered for treatment beginning immediately after her scheduled sentencing hearing.

The trial court conducted a sentencing hearing. During the hearing, the State recommended a residential DOSA sentence with twenty-four months community custody for the second degree burglary charge and a suspended jail sentence for the third degree theft charge. The State commented that the crime stemmed from a combination of

chemical dependency and mental illness and, based on these factors, the State deemed the

DOSA to be the best sentence for Debra Shoemaker.

Victim George Harmon attended the sentencing hearing. During the hearing, the

trial court allowed Steve Myers, a friend of George Harmon's grandson, to speak on

Harmon's behalf. Myers is a licensed attorney in Oregon, but not in Washington. Myers

asserted at the hearing that he did not legally represent George Harmon but represented

Harmon and his family as a friend. Nevertheless, the State concedes that Harmon paid

Myers tens of thousands of dollars for his services.

During his presentation at the sentencing hearing, Steve Myers presented

information concerning the crimes not embedded in the affidavit of probable cause or in

Deborah Shoemaker's statement on plea of guilty. When rendering the judgment and

sentence, the sentencing court acknowledged that the court record lacked information

provided by Myers. Myers told the court that for the last eighteen months, with the help

of a private investigator, he had reconstructed the crime and its aftermath.

Steve Myers commented that George Harmon's wife of sixty-three years died

December 5, 2015. According to Myers, Harmon left his Wenatchee home on January

17, 2016, to visit family in Portland, Oregon, in order to cope with his wife's death.

Harmon celebrated his eighty-sixth birthday on January 23, the day before the burglary.

Debra Shoemaker's husband participated in a car sharing arrangement with one of

George Harmon's relatives, and the husband learned that Harmon would temporarily

3

vacate his residence. Myers asserted, during the sentencing hearing, that Shoemaker and her cohort Cindy Simpson devised a plan to enter the residence during Harmon's absence.

Steve Myers argued that, based on his investigation, Debra Shoemaker and Cindy Simpson took one car to George Harmon's residence because of an intent to also steal Harmon's car. The pair took a crowbar and cracked the double bolted garage door frame in order to enter the home. He added that the two placed "virtually all . . . [of Harmon's] mementos—heirlooms, jewelry, clothing—that belonged to his wife including . . . his-and-her watches, his-and-hers diamond rings." Report of Proceedings (RP) (July 17, 2017) at 11. The thieving couple also lifted a file that contained important documents, including George Harmon's wife's death certificate and documents containing identifying information for the wife. The two also stole Harmon's car.

Steve Myers declared that Debra Shoemaker and Cindy Simpson abandoned George Harmon's car in a park. In the meantime, the duo vacuumed and wiped the car to erase fingerprints and dissembled the fob. The disassembling of the fob might prevent another from retrieving information as to the travel pattern of the car.

Steve Myers next described the mementos as "really important" to George Harmon. RP (July 17, 2017) at 12. The family, in turn, desperately sought to recover the heirlooms. The family spoke to Debra Shoemaker in the prosecutor's office and inquired as to the location of the personal property. According to Myers, when questioned, Debra

4

Shoemaker denied knowledge of the whereabouts of the belongings. Shoemaker claimed she last saw the belongings in the duffel bag when Cindy Simpson toted the bag into her home. By the time of the sentencing hearing, George Harmon had not recovered any stolen objects, including his wife's death certificate.

Steve Myers ended his comments, during the sentencing hearing, by emphasizing the "depraved" nature of Shoemaker's conduct and the magnitude of the impact of the crime on George Harmon and his family. RP (July 17, 2017) at 15. Myers asked that the sentencing court decline a DOSA sentence and impose a prison term that accounts for the "extraordinary circumstances" of the crime. RP (July 17, 2017) at 15. Myers stated George Harmon steadfastly desired Shoemaker in prison.

Next, during the sentencing hearing, Mike Rollins, grandson of George Harmon, addressed the court. According to Rollins, Cindy Simpson and Debra Shoemaker took every memento of the grandmother, all invaluable to Harmon. Rollins portrayed the action of Shoemaker and Simpson as "one of the coldest things I've ever witnessed." RP (July 17, 2017) at 16. Rollins pleaded for a harsh sentence against Debra Shoemaker.

During the sentencing hearing, Debra Shoemaker's defense attorney presented facts diverging from the facts and views presented by Steve Myers. Defense counsel stated that Shoemaker had shown candor in describing events. Counsel insisted that someone else returned to George Harmon's home after Cindy Simpson and Debra Shoemaker left the home and stole additional property. In other words, according to

5

counsel, Shoemaker did not pilfer all of the items claimed stolen by George Harmon. Counsel knew of this additional thieving because of information provided by George Harmon and his family during talks with Debra Shoemaker and counsel. According to counsel, Debra Shoemaker also told Cindy Simpson to return some of the stolen objects.

Defense counsel explained, during the sentencing hearing, that Debra Shoemaker suffered from a mental illness and that she self-medicates to negotiate the illness. According to counsel, Shoemaker "ping-pongs" from thought to thought during conversations. RP (July 17, 2017) at 17. Counsel requested the sentencing court grant Shoemaker a residential DOSA sentence.

Sharon Clifner, Debra Shoemaker's psychiatric nurse practitioner, also spoke on Shoemaker's behalf and wrote a letter to the court. In her letter, Clifner related concerns for Shoemaker's safety at home because of domestic violence committed by her husband. Clifner noted that Shoemaker's husband broke Shoemaker's arm in a fight the previous year. Because of the domestic violence, Shoemaker felt unsafe at home. Clifner reported the insecurity drove Shoemaker's desire to spend time away from the home, which turned Shoemaker to gambling.

At the sentencing hearing, Sharon Clifner addressed Debra Shoemaker's mental illness and the value of a DOSA sentence. Clifner stressed Shoemaker's instability and need to begin another medication regimen. Clifner reasoned that a DOSA sentence

6

would place Shoemaker in a safe treatment program that would resolve underlying mental health issues that contributed to the crime.

Debra Shoemaker began her allocution, during the sentencing hearing, by apologizing to George Harmon and his family for her senseless actions and the fear she caused. At the same time, Shoemaker denied taking any personal property from the Harmon residence. Shoemaker acknowledged her mental health illness, excessive gambling, poor choice of friends, use of controlled substances, and her need for treatment. She promised to seriously engage in treatment. Shoemaker added that she already treated with a therapist and took prescribed medications. She accepted full responsibility for her actions and stated that she did not wish to render bad choices again.

When issuing its sentence, the sentencing court emphasized the compelling circumstances of the crime and the impact on George Harmon as based on the details provided by Steve Myers and Mike Rollins. When the court commented that Debra Shoemaker and Cindy Simpson took mementoes of George Harmon and his deceased wife, Debra Shoemaker interrupted the court and the two engaged in a colloquy. Shoemaker stressed that she begged Cindy Simpson to return property to George Harmon, after which Simpson expelled Shoemaker from Simpson's residence. When the sentencing court remarked that Shoemaker took no steps to assist the Harmons in regaining possessions, Shoemaker claimed she assisted the Harmon family in locating heirlooms. The sentencing court asked Shoemaker why Shoemaker had not reported the

7

theft to the police when Simpson refused to return the property. Shoemaker explained

that she purchased a $4.99 phone to report that Simpson intended to sell the car. She then

anonymously phoned the police and reported the location of the stolen car. Her call led

to the retrieval of the car. A representative of George Harmon confirmed that an

anonymous call resulted in the location of the car, although not any personal items.

RCW 9.94A.530(2) controls this appeal and dictates whether the trial court

should have conducted an evidentiary hearing during sentencing. The statutory

section reads:

> In determining any sentence other than a sentence above the standard range, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing, or proven pursuant to RCW 9.94A.537. Acknowledgment includes not objecting to information stated in the presentence reports and not objecting to criminal history presented at the time of sentencing. Where the defendant disputes material facts, the court must either not consider the fact or grant an evidentiary hearing on the point. The facts shall be deemed proved at the hearing by a preponderance of the evidence, except as otherwise specified in RCW 9.94A.537.

(Boldface omitted.)

Pursuant to RCW 9.94A.530(2), a court may only consider facts admitted or

acknowledged by a defendant or proved at trial in determining her sentence. *State*

*v. Talley*, 83 Wn. App. 750, 756, 923 P.2d 721 (1996), *aff'd*, 134 Wn.2d 176, 949

P.2d 358 (1998). If a defendant disputes any material facts on which the court

8

intends to rely, the sentencing court can either disregard the disputed facts or require the State to prove them by a preponderance of the evidence at a hearing for this purpose. *State v. Talley*, 83 Wn. App. at 756. When the defendant disputes a material fact, the court must grant an "evidentiary hearing" on the disputed points. *State v. Talley*, 83 Wn. App. at 757. The sentencing court should not punish the defendant based on facts not proven. *State v. Talley*, 83 Wn. App. at 757.

Under RCW 9.94A.530(2), a precondition to an evidentiary hearing is the defendant's dispute of facts or failure to acknowledge facts presented as part of the sentencing procedure. I distinguish between expressly disputing facts and failing to acknowledge facts and address the former first.

Steve Myers, the Oregon attorney, expressly or by strong implication, declared that Debra Shoemaker stole all objects missing from George Harmon's home. Mike Rollins, grandson of George Harmon, declared that Debra Shoemaker took every memento of the grandmother. The sentencing court commented that Debra Shoemaker took all the mementos. Steve Myers added that Shoemaker participated in vacuuming and wiping the car to erase fingerprints and contributed to dissembling the car's key fob so that law enforcement could not discern the stolen car's travel pattern. Myers strongly implied that Shoemaker failed to

cooperate, if not lied, when Shoemaker denied the current whereabouts of George Harmon's belongings. Debra Shoemaker's defense attorney and Debra Shoemaker disputed all of these facts and views presented by Steve Myers and Mike Rollins.

George Harmon's representatives and Debra Shoemaker also disagreed as to whether Shoemaker exerted any effort to help reclaim some of the stolen property. The sentencing court likely adopted George Harmon's rendition of the facts regarding cooperation. The State may consider the sentencing court's view that Debra Shoemaker failed to cooperate more of a value judgment, than a finding of fact. I disagree. Whether or not one cooperates involves a fact, just as one's intent to commit a crime constitutes an issue of fact for a jury.

RCW 9.94A.530(2) allows the sentencing court to rely on information found in the statement on plea of guilt. The State mentions that Debra Shoemaker, in her statement on plea of guilty, agreed that she stole all items missing from George Harmon's residence. I disagree. Shoemaker agreed that she stole items valued at less than $750. The statement does not declare that she took all items claimed stolen by George Harmon, Harmon's family, and Harmon's Oregon lawyer.

The State argues that Debra Shoemaker did not dispute any facts presented by Steve Myers and Mike Rollins, but rather disputed inferences to be drawn from

10

those facts. According to the State, Shoemaker and George Harmon's representatives disagreed as to the value to place on evidence. As shown above, Shoemaker disputed facts, not simply inferences to draw from the facts. Anyway, inferences from undisputed facts are as important as the underlying facts as illustrated by the summary judgment rule that the trial court must deny a summary judgment motion and permit the civil case to go to trial if different inferences may be drawn from the undisputed facts.

Since I conclude that Debra Shoemaker disputed facts presented by George Harmon's representatives at the sentencing hearing, I need not decide whether Debra Shoemaker failed to acknowledge other facts presented by Harmon's representatives. I note, however, that Shoemaker never expressly acknowledged a host of factual allegations forwarded by Steve Myers and Mike Rollins.

RCW 9.94A.530(2) and case law distinguish between what facts the offender acknowledges when she presents no countervailing facts but does not expressly object to facts presented by the State or the victim. Information contained in a presentence report and criminal history lies in one category. Under the statute, acknowledgment includes not objecting to information stated in the presentence reports. *State v. Talley*, 83 Wn. App. at 757. Nevertheless, Debra

Shoemaker's appeal involves no presentence report or criminal history.

Because RCW 9.94A.530(2) omits reference to facts other than information found in the criminal history and those facts contained in the presentence report, I conclude that silence of Debra Shoemaker in response to comments by Mike Rollins and Steve Myers did not constitute an acknowledgment of facts contained in the remarks. In *State v. Talley*, this court held that the sentencing court improperly considered police reports and the affidavit of probable cause during sentencing because the defendant never "admitted" to the facts contained therein. *State v. Young*, 51 Wn. App. 517, 754 P.2d 147 (1988) has a similar outcome. These decisions strongly imply that, unless the offender expressly agrees to a fact, the defendant has not acknowledged the fact.

According to the Washington Supreme Court, in *State v. Ford*, 137 Wn.2d 472, 482, 973 P.2d 452 (1999), the failure to object to factual assertions at a sentencing hearing does not relieve the State of its evidentiary obligations. Otherwise, the burden of proof would unconstitutionally shift to the defendant.

Debra Shoemaker and her attorney's presentation and tone of presentation showed that she disagreed with assertions from Steve Myers beyond those assertions against which Shoemaker presented countering facts. One need not use

12

any particular form of words to present an objection. *Flaxer v. United States*, 358

U.S. 147, 151-52, 79 S. Ct. 191, 3 L. Ed. 2d 183 (1958).

I disagree with the majority that the offender must expressly ask for an

evidentiary hearing in order to receive one at the time of sentencing. RCW

9.94A.530(2) does not demand an evidentiary hearing only when the defense

requests such a hearing. The trial court has the responsibility under the statute to

hold an evidentiary hearing if it wants to consider disputed facts. *State v. Talley*,

83 Wn. App. at 759.

I must next determine what constitutes an evidentiary hearing. The State

impliedly argues that Debra Shoemaker's sentencing court conducted a sentencing

hearing. I conclude that, at a minimum, witnesses should be placed under oath and

subjected to cross-examination at the sentencing evidentiary hearing. The court

should, on the record, resolve any disputed facts.

Most reported decisions that mention an evidentiary hearing entail a mini-

trial with witnesses under oath and cross-examined. In the setting of committed

sexually violent predators, the court annually conducts a show cause hearing to

determine whether the individual is entitled to an "evidentiary hearing." *State v.*

*McCuistion*, 174 Wn.2d 369, 380, 275 P.3d 1092 (2012). Thus, an evidentiary

13

hearing should be deemed as involving more than the process occurring during a

show cause hearing. The law assumes an evidentiary hearing to be more than

advocates reciting facts in a summary proceeding or the review of affidavits and

records.

Black's Law dictionary provides definitions for "evidentiary hearing."

> **evidentiary hearing** (1952) **1.** A hearing at which evidence is presented, as opposed to a hearing at which only legal argument is presented. **2.** See ADMINISTRATIVE PROCEEDING.

BLACK'S LAW DICTIONARY 836 (10th ed. 2014). In turn, the legal dictionary

defines "administrative proceeding":

> **administrative proceeding** (1841) A hearing, inquiry, investigation, or trial before an administrative agency, usu. adjudicatory in nature but sometimes quasi-legislative. — Also termed *evidentiary hearing*; *full hearing*; *trial-type hearing*; *agency adjudication.*

BLACK'S LAW DICTIONARY 54 (10th ed. 2014). These definitions assume a mini-

trial.

The State forwards RCW 2.28.150 as bestowing discretion on the sentencing

court when determining procedures at the sentencing hearing. The statute reads:

> When jurisdiction is, by the Constitution of this state, or by statute, conferred on a court or judicial officer all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by statute, any

14

> suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the laws.

The State reads too much into the statute. Washington courts have already held, based on RCW 9.94A.530(2), that, when the offender disputes facts, the sentencing court must conduct an "evidentiary hearing." Debra Shoemaker's liberty interests were at stake during a sentencing hearing. This court must construe RCW 2.28.150 strictly because of a deprivation of liberty. *In re Carson*, 84 Wn.2d 969, 973, 530 P.2d 331 (1975).

The State observes that evidence rules do not apply during a sentencing hearing. ER 1101(c)(3). I agree with the State. Nevertheless, the disavowal of evidence rules does not excuse placing those providing testimony and declaring facts under oath and subjecting them to cross-examination.

The sentencing court need not enter formal findings of fact during a sentencing evidentiary hearing. Nevertheless, the court should state on the record its resolution of disputed facts as part of the evidentiary hearing.

A parole revocation hearing requires minimum due process standards such as the right to confront and cross-examine adverse witnesses and a written statement by the fact finder as to the evidence on which he or she relies. *State v. Abd-Rahmaan*, 154 Wn.2d 280, 286, 111 P.3d 1157 (2005). A sentencing hearing

holds as much importance as a parole revocation hearing. The sentencing court should consider only adjudicative evidence that the parties in an adversarial context have the opportunity to scrutinize, test, contradict, discredit, and correct. *State v. Grayson*, 154 Wn.2d 333, 340, 111 P.3d 1183 (2005).

In *State v. Ford*, 137 Wn.2d at 484 (1999), the Washington Supreme Court wrote:

> Sentencing is a critical step in our criminal justice system. The fact that guilt has already been established should not result in indifference to the integrity of the sentencing process. Determinations regarding the severity of criminal sanctions are not to be rendered in a cursory fashion. Sentencing courts require reliable facts and information. To uphold procedurally defective sentencing hearings would send the wrong message to trial courts, criminal defendants, and the public:
>
>> The meaning of appropriate due process at sentencing is not ascertainable in strictly utilitarian terms. There is an important symbolic aspect to the requirement of due process. Our concept of the dignity of individuals and our respect for the law itself suffer when inadequate attention is given to a decision critically affecting the public interest, the interests of victims, and the interests of the persons being sentenced. Even if informal, seemingly casual, sentencing determinations reach the same results that would have been reached in more formal and regular proceedings, the manner of such proceedings does not entitle them to the respect that ought to attend this exercise of a fundamental state power to impose criminal sanctions.
>
> *American Bar Association*, STANDARDS FOR CRIMINAL JUSTICE: *SENTENCING* std. 18-5.17, at 206 (3d ed. 1994).

16

The peculiar circumstances of Debra Shoemaker's sentencing particularly merited an evidentiary hearing. The sentencing court's decision was as critical as determining guilt or innocence. The court decided whether Shoemaker received needed treatment or spent months in prison. Shoemaker deserved similar protections in the fact finding process at sentencing as she would have merited if she disputed her guilt in committing the crime.

The sentencing court would act within its discretion in denying a DOSA. Nevertheless, any denial should come after an evidentiary hearing. Debra Shoemaker requests that any remand be directed to another sentencing judge. The sentencing judge is an excellent and fair judge, who need not be removed from any remand.

_____
Fearing, J.

17